IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In Re:
PATRICIA MARLAINA REID,            Case No. 18-1629-JCO
                                                  Chapter 7

    Debtor.

_____

UNITED STATES OF AMERICA,

    Plaintiff,

                                                  Adversary Case No. 18-38-JCO

v.

PATRICIA MARLAINA REID,

    Defendant.

<u>POST-TRIAL MEMORANDUM OPINION AND ORDER ON
COMPLAINT FOR NONDISCHARGEABILITY</u>

This matter came before the Court for a trial on April 8, 2019, on the Complaint filed by the United States of America on behalf of its agency, the United States Department of Agriculture, Farm Service Agency (hereinafter referred to as "the USA" or "FSA") against Chapter 7 Debtor and Defendant, Patricia Marlaina Reid (hereinafter referred to as "Debtor" or "Reid"). Appearing on behalf of the USA was attorney Keith Jones, and on behalf of the Debtor was attorney Judson Crump. At the conclusion of the trial, the Court took the matter under submission and now issues its ruling thereon.

<u>JURISDICTION</u>

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157, and the order of reference of the District Court dated August 25, 2015. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the Court has authority to enter a final order.

## FACTS AND PROCEEDINGS

The facts of this case are undisputed and the Court adopts the Stipulation of Undisputed Facts filed by the parties as set forth below. (Doc. 28).

Prior to March of 2016, Debtor testified that in order to start the farm that she had always dreamed of, she took out a loan to purchase twenty acres in Monroe County, Alabama. At the time of the land purchase, she was in a relationship with her boyfriend, Joshua Sawyer. Joshua Sawyer lived on the Frye Road Property with her and is also the father of her children.

On March 16, 2016, Debtor executed a promissory note, designated Loan Number 1, promising to pay the United States of America, acting through the Farm Service Agency, United States Department of Agriculture, the principal sum of $44,000 plus interest at a rate of 2.625%. On March 16, 2016, she also executed a promissory note, designated Loan Number 2, promising to pay FSA the principal sum of $6,000 plus interest at a rate of 2.625%. (Together, these promissory notes on Loan Number 1 and Loan Number 2 are hereinafter referred to as the "Notes"). On March 16, 2016, Reid also executed a security agreement granting FSA a security interest in "All farm equipment . . . and inventory, now owned or hereafter acquired by the Debtor, together with all replacements, substitutions, additions, and accessions thereto, including but not limited to the following which are located in the State of Alabama."

In addition, the security agreement specifically included the following items:

   7' x 16' utility trailer;
   16' gooseneck livestock trailer; New Holland tractor;
   New Holland loader;
   6 ½" disc with 20" blades; Silver Edge 6' cutter;
   8' drag with ½" tines; Skid Steer bale spear;
   100 gallon Rubbermaid tank;
   300 gallon Rubbermaid tank;
   CNC Headgate head catch;

Ten (10) beef breeding cows; and Nine (9) calves.[1]

Reid purchased the collateral with the loan proceeds and kept the collateral in her possession at the Frye Road property. Under the security agreement, Debtor was supposed to keep the cattle or return them to the FSA. She admitted that she was not permitted to sell or otherwise dispose of the cattle or the equipment.

In June of 2016, Reid learned of a dispute regarding the twenty acres she purchased to run the farm. The dispute involved a restriction against having cattle on the property. She testified that when she purchased the land in early 2016, she was told by the sellers that there were no restrictions on the property and that she could have cattle on it and such was reflected in the paperwork of the land purchase. In August of 2016, she went to court regarding the dispute; however, before going to court on the dispute, she contacted the FSA to ask for help in defending her, and the FSA told her that FSA lawyers represent the interests of FSA only and not FSA borrowers. The case was resolved with a finding that the restriction against cattle was in place, and she was given thirty (30) days to vacate the property.

By this time, Reid noticed that the collateral, except for the New Holland tractor and the cattle, gradually went missing. Debtor was also becoming aware that Sawyer had a drug problem, and she began to suspect that he was selling the property for drugs. Sometime during October of 2016, Debtor saw a man in her field with a trailer, loading cattle onto the trailer. Debtor testified that she and her two kids approached the man, who goes by the name of "Rigsby," and heatedly told him he was not permitted to remove the cattle from her

---

[1] Hereinafter referred to collectively as "cattle."

property. Rigsby told her to take that issue up with her boyfriend, Joshua Sawyer. Debtor continued to attempt to stop Rigsby from taking the cattle but was ultimately unsuccessful.

Despite her efforts to stop Rigsby from taking the cattle, Reid did not contact the police or report any of the missing collateral as stolen. Reid did not seek authorization from FSA to allow anyone to conceal, remove, sell, or otherwise dispose of the missing collateral. Reid did not affirmatively inform the FSA that the cattle had been stolen, and she did not attempt to recover or locate the missing collateral, or contemporaneously notify FSA of the missing collateral.

Sawyer was arrested in October 2016, for drug crimes and eluding the police. Reid vacated the Frye Road property in October or November 2016. The only collateral remaining at the property was the New Holland tractor, which she listed for sale on Facebook. Reid testified that she sold the New Holland tractor to an unknown purchaser for between $6,000.00 and $8,000.00. When asked whether she could obtain the purchaser's information from her Facebook history, Reid testified that she deleted the Facebook account years ago and no longer has access to that information. She then testified that she used the proceeds from the sale of the New Holland tractor to bail Sawyer out of jail. Reid admitted that she did not seek authorization from FSA to conceal, remove, sell, or otherwise dispose of the New Holland tractor, nor did she ever attempt to recover or locate the New Holland tractor, or notify FSA that she sold the New Holland tractor. Debtor testified that she never sold any of the other equipment listed in the security agreement, and only received money from the sale of the tractor, which was used as Sawyer's bail. When asked why she never filled out a police report regarding the stolen collateral, Debtor's explanation was that Sawyer was the father to her child.

Reid testified that payments on the loan were due annually, but she never made a payment toward either loan as the first payment had not become due when she vacated the property. Reid testified that she never intended to injure the FSA, and never intended for the collateral to be stolen in breach of the agreement with FSA. When asked about other collateral in her possession not included in the FSA security agreement, such as a Chevrolet Silverado financed through Tyndall Federal Credit Union and a Ford F-150 financed through another bank, she testified that she understood that those creditors would repossess the collateral and sue her for the debt if she did not make regular payments thereon.

Testifying on behalf of the FSA, was Bryan Rhea. Mr. Rhea testified he has been a loan manager for twelve years for the FSA and he supervises three employees in the areas of loan making and loan servicing in ten counties. He stated he personally assisted Debtor in obtaining the two loans at issue when she came to the FSA in March of 2016. When he was questioned about his conversations with Debtor regarding the land dispute, he reiterated that FSA had an interest in the collateral and cows only, not the real property. He also stated that when Debtor reached out to him regarding the land dispute, he understood it to be merely a dispute and not a lawsuit at that time. Even so, he stated that it is the borrower's responsibility to notify FSA that the collateral was in danger, and at that point, he assessed no danger to the collateral. More importantly, at this point, he stated that Debtor was not delinquent on the loan, so they had no reason to repossess the collateral. Mr. Rhea stated that in October of 2016, FSA performed a collateral inspection wherein the FSA learned that the cattle was gone and that there was no equipment on the property. This was the only collateral inspection performed other than the initial visit to the property for the application process. Mr. Rhea testified that the FSA filed a UCC-1 on the New Holland tractor, and could presumably go repossess the tractor

if they could find it.  He stated that the FSA performed an investigation of the location of the collateral, asking neighbors, visiting the property, etc., but were unsuccessful in determining the whereabouts of the tractor.

Based on Debtor's acts and omission discussed above, the USA requests that the Court find the debt owed to the FSA in the amount of $52,048.56 plus interest be found nondischargeable pursuant to 11 U.S.C. § 523(a)(2) for fraud, (a)(4) for fiduciary defalcation and embezzlement, and (a)(6) for willful and malicious injury.

Debtor requests a finding that she lacked the requisite intent to harm the FSA at every stage of this loan and the Court should find the debt owed to the FSA dischargeable in its entirety.  For the following reasons, the Court finds that the debt owed to the FSA by Debtor is nondischargeable in the amount of $7,000.00, which is the approximate amount for which Debtor improperly sold the New Holland tractor.

## CONCLUSIONS OF LAW

### 11 U.S.C. § 523 Exceptions to Discharge

"Exceptions to the discharge of a particular debt are strictly construed in favor of the defendant." *In re Kanewske*, 2017 WL 4381282, at *6 (Bankr. M.D. Fla. Sept. 29, 2017).  Here, the defendant is the Debtor.  "[T]he denial of a defendant's discharge is an 'extraordinary remedy' and an 'extreme penalty' to the defendant. *Id.*  Therefore, any challenge to a defendant's discharge must be construed strictly against the objecting party and liberally in favor of the defendant.  *Id.*  The standard of proof to be applied in all § 523(a) dischargeability proceedings is "the ordinary preponderance-of-the-evidence standard." *Matter of Staggs*, 573 B.R. 898, 908 (Bankr. N.D. Ala. 2017)(*citing Grogan v. Garner*, 498 U.S. 279, 286-88 (1991)).

### § 523(a)(2) Fraud in Obtaining the Debt

Count I[2] in the USA's Complaint requests relief pursuant to § 523(a)(2) which renders nondischargeable any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent it was *obtained* by fraud. The USA admits that Debtor did not obtain the loans under any sort of fraud, (*See* USA Trial Brief, Doc. 29 at 10), thus the Court finds in favor of the Defendant and the relief requested under Count 1 is due to be and hereby is DENIED.

§ 523(a)(4) Fraud or Defalcation in A Fiduciary Capacity,
Embezzlement, or Larceny

Under Count II of the Complaint, the USA requests that the entire debt owed by Debtor be found nondischargeable due to Debtor's embezzlement of the collateral pledged as security on the loans. Section 523(a)(4) excepts from discharge any debt that was obtained by debtor by fraud or defalcation while acting a fiduciary capacity,[3] embezzlement, or larceny.[4] The statute is written in the disjunctive, so one's debt can be nondischargeable if they are found to have

---

[2] Every Count in the USA's Complaint is labelled as "Count I." Each Count in the Complaint is hereinafter referred to numerically as Count I, Count II, and Count III. Count I is pursuant to § 523(a)(2), (Doc. 1 at 5, ¶ 13-20; Count II is pursuant to §523(a)(4), (Doc. 1 at 6, 21-24); and Count III is pursuant to § 523(a)(6), (Doc. 1 at 7 ¶ 25-27).

[3] Though pled in its Complaint, the USA did not put on any evidence regarding Debtor's alleged fraud or defalcation in a fiduciary capacity, and the Courts finds that any claim regarding this portion of § 523(a)(4) fails as a matter of law. "To establish fraud while acting in a fiduciary capacity, one must show (1) that the debt results from a fiduciary's defalcation under an express or technical trust; (2) that the debtor acted in a fiduciary capacity with respect to the trust; and (3) that the transaction in question is a defalcation [or fraud] within the meaning of bankruptcy law." *In re Migell*, 2018 WL 1174890, at *5 (Bankr. M.D. Fla. Mar. 2, 2018) (citations omitted). An express or technical trust exists when there is: (1) a segregated trust res; (2) an identifiable beneficiary; and (3) affirmative trust duties established by contract or by statute." *In re Kanewske*, 2017 WL 4381282, at *7. Further, the "trust relationship [shall] have existed prior to the act which created the debt in order to fall within the fiduciary capacity exception." *In re Fernandez-Rocha,* 451 F.3d 813, 816 (11th Cir. 2006). The facts here are clear that no trust relationship existed prior to the act which created the debt in order to fall within this exception to discharge. Thus, any request for relief as to Debtor's alleged fiduciary capacity is DENIED.

[4] The USA did not plead larceny as a ground for nondischargeability; therefore, this Court will abstain from considering such.

engaged in fraud as fiduciary, or have committed the act of embezzlement, or have committed the act of larceny regarding the debt.

The USA fails to specifically address the allegation of embezzlement in its Complaint, and raises the issue for the first time in its pretrial brief. Despite failing to specifically plead embezzlement in the Complaint, the Court finds that the USA is not excluded from litigating the same at trial. Where a complaint does not specifically use the term "embezzlement," if the facts as pled in the complaint arise to the act of embezzlement, then embezzlement can nonetheless be adequately pled. *See In re Taylor*, 551 B.R. 506, 521 (Bankr. M.D. Ala. 2016). Therefore, because the USA has pled facts that appear to rise to the level of embezzlement, the Court will consider the evidence presented in relation to the allegation of embezzlement.

"Bankruptcy courts define embezzlement as the 'fraudulent appropriation of property of another by a person to whom such property has been entrusted or to whose hands it has lawfully come.'" *In re Taylor*, 551 B.R. 506, 521 (Bankr. M.D. Ala. 2016)(*citing Matter of Weber,* 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States,* 160 U.S. 268, 269(1895)); *see also Belfry v. Cardozo (In re Belfry),* 862 F.2d 661, 662 (8th Cir.1988). To establish embezzlement, a creditor must show that: (1) the creditor entrusted property to the debtor; (2) the debtor appropriated the property for a use other than that for which it was entrusted; and (3) the circumstances indicate fraud." *Matter of Chaney*, 596 B.R. 385, 405 (Bankr. N.D. Ala. 2018). "Debts which arise from simple conversion are not excepted from discharge." *In re Taylor*, at 521. Instead, "the creditor must show that the misappropriation was done with fraudulent intent." *Ibid.* "Fraudulent intent may be inferred from surrounding circumstances and the conduct of the accused." *Ibid.*

*Application*

Considering the evidence presented at trial and the record as a whole, the Court finds that the first two elements of embezzlement are satisfied: (1) the FSA entrusted property to the Debtor and (2) the Debtor appropriated the property for a use other than that for which it was entrusted. The third element (that the circumstances indicate fraud), however, is not satisfied. The burden of proof on dischargeability issues the "the ordinary preponderance-of-the-evidence standard." *Matter of Staggs*, 573 B.R. 898, 908 (Bankr. N.D. Ala. 2017)(*citing Grogan v. Garner*, 498 U.S. 279, 286-88 (1991)). Any challenge to a defendant's discharge must be construed strictly against the objecting party and liberally in favor of the debtor. *In re Kanewske*, 2017 WL 4381282, at *6 (Bankr. M.D. Fla. Sept. 29, 2017). Here the Court construes the evidence liberally in favor of the Debtor and finds that the USA failed to meet its burden of proof that the circumstances indicate fraud rising to the level of embezzlement. Therefore, the relief requested in Count II is due to be and hereby is DENIED.

<u>11 U.S.C. § 524(a)(6) Willful or Malicious Injury</u>

Finally, the USA requests relief in Count III pursuant to § 523(a)(6) for willful and malicious injury when Debtor sold the New Holland tractor, used the proceeds for her own benefit, and failed to inform the FSA of the sale of the tractor. Having considered the evidence presented, the Court finds in favor of the USA and concludes that the value of the New Holland tractor is nondischargeable.

To succeed under Section 523(a)(6), a creditor must prove that the injury at issue is both willful and malicious. *In re Carter*, 2018 WL 4945128, at *6 (Bankr. M.D. Fla. Oct. 11, 2018). Willfulness requires "a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another." *In re Walker,* 48 F.3d 1161, 1163 (11th Cir. 1995).

"Malicious means that the debtor's act be "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Id.* The debtor must commit an act "the purpose of which is to cause injury or which is substantially certain to cause injury." *In re Carter,* 2018 WL 4945128, at *6; *In re Walker,* 48 F.3d 1161, 1165 (11th Cir. 1995). To establish malice for purposes of § 523(a)(6), "a showing of specific intent to harm another is not necessary." *Matter of Vickrey*, 2018 WL 5255218, at *6 (Bankr. N.D. Ala. Oct. 1, 2018)(*citing Beem v. Ferguson,* 713 Fed. Appx. 974, 984 (11th Cir. 2018)).

Section 523(a)(6) does not reach a mere "failure to meet a duty of care that results in injury to someone." *Matter of Vickrey*, 2018 WL 5255218, at *6 (Bankr. N.D. Ala. Oct. 1, 2018)(*citing Loucks v. Smith,* 531 B.R. 1, 12 (Bankr. M.D. Ala. 2015)(Sawyer, J.)). A negligent or even reckless act is not sufficient to except a debt from discharge under Section 523(a)(6). *Carter* at *6.* When financial harms are alleged, it must be shown that the debtor "actually knew, at the time of the intentional act, that injury was substantially certain to result." *Petroleum Realty I, LLC v. McCravy (In re McCravy)*, 2015 WL 3916811, at *9 (Bankr. S.D. Fla. 2015); *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1293 (11th Cir. 2014).

"The Eleventh Circuit has acknowledged that the Circuits are split as to whether the term 'substantial certainty' is a subjective standard, requiring a creditor to prove that the debtor actually knew that the act was substantially certain to injure the creditor, or an objective standard, requiring a creditor to show only that a debtor's act was in fact substantially certain to cause injury." *Matter of Nix,* 2018 WL 3339620, at *5 (Bankr. N.D. Ala. July 6, 2018), *aff'd sub nom. Nix v. PNC Bank, N.A.*, 2019 WL 450853 (N.D. Ala. Feb. 5, 2019)(*citing In re Kane*, 755 F.3d at 1293; *In re Monson*, 661 Fed. Appx. 675 n. 9 (2016)). "The Court of Appeals has declined on two at least occasions to parse the distinction, finding each time that even under the

more stringent subjective standard that the evidence in the cases before it supported a finding of nondischargeability." *Nix*, 2018 WL 3339620, at *5.

>In *Nix*, Judge Jessup succinctly summarized *Monson,*
>>In the case of *Monson v. Galaz (In re Monson)*, the creditor loaned the debtor $130,000 to open an internet gaming center. The debtor and creditor entered into an agreement which provided that the creditor would loan the debtor $130,000 for the creation of the center. The agreement further provided that in the event the parties agreed to terminate the business, that all material assets would be liquidated and first used to pay back the loan. After law enforcement raided the gaming center and seized the equipment, the creditor issued a notice to the debtor terminating his interest in the center and demanding liquidation of the assets to repay the loan. Instead, the debtor entered into an agreement with law enforcement that permitted him to retrieve the equipment upon agreeing to remove the equipment from the county. Upon retrieving the equipment, the debtor absconded with the equipment and failed to pay the creditor pursuant to the terms of their agreement. After the creditor obtained a judgment against the debtor in state court, the debtor filed for relief under Chapter 7 of the Bankruptcy Code, and the creditor filed a complaint seeking to have the judgment excepted from discharge.
>>At trial, the debtor argued that once he received a notice of default and a letter from the creditor purporting to terminate their agreement, he believed that their entire agreement was "finished, and done with." The debtor also disputed whether the creditor had a valid security interest in the equipment because the debtor never signed the security agreement despite having agreed to sign any required documents.

*Matter of Nix*, No. 17-81289-CRJ-7, 2018 WL 3339620, at *6. The bankruptcy court in *Monson* found the debtor's conduct substantiated a finding under § 523(a)(6) for willful and malicious injury within the meaning of the statute. *Id.* The Eleventh Circuit affirmed on appeal stating that the act of absconding with the creditor's collateral and using it to open a new business was an "intentional act the purpose of which was to cause injury or which was substantially certain to cause injury." *Id.*

The facts in *Nix* are similar:

> Dr. Nix, borrowed $75,000.00 from PNC Bank to purchase five membership units in Crestwood and executed a Pledge and Security Agreement pursuant to which he pledged his interest in the Membership Units to the Bank and any proceeds of the Units as collateral for the loan. Pursuant to the terms of the Pledge and Security Agreement, Dr. Nix had a duty to turnover any proceeds from the sale of the Membership Units to the Bank. The word "Pledge" in the title of the document signed by Dr. Nix clearly alerted him that the proceeds of the Membership Units were pledged to the Bank. Nevertheless, Dr. Nix sold the Membership Units to Crestwood in four separate transactions over a course of seven years, failed to pay the proceeds to PNC, never informed PNC that he had sold the Units, and deceived Crestwood about the existence of any competing interest to the proceeds. Dr. Nix acknowledges that he used the proceeds to pay the Internal Revenue Service and other expenses rather than paying the Bank as required by the Pledge and Security Agreement. Dr. Nix continued to make payments to the PNC during the sale of the Membership Units, further concealing each sale from PNC by subterfuge and deception.

*Matter of Nix*, No. 17-81289-CRJ-7, 2018 WL 3339620, at *6. The bankruptcy court found that Dr. Nix knew that his actions were substantially certain to cause injury to PNC's ability to obtain repayment of its loan for purposes of § 523(a)(6). The bankruptcy court further found that that Dr. Nix committed a malicious injury because the injury was wrongful and without just cause, and excessive for purposes of § 523(a)(6).

Regarding the element of malice, the "Eleventh Circuit has explained that a showing of specific intent to harm another is not necessary." *Id.* (*citing In re Kane,* 755 F.3d 1294). "Instead, for purposes of § 523(a)(6) "[m]alice can be implied. . . and constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." *Nix,* 2018 WL 3339620, at *7 (*citing Monson,* 661 Fed. Appx. at 683)(citation omitted)).

Applying *Monson* and *Nix* to the evidence presented at trial in this case, the Court finds that Debtor's sale of the New Holland tractor and misappropriation of the sale proceeds to pay her boyfriend's bail is sufficient to establish a willful and malicious injury to the USA. Debtor's

testimony regarding the two vehicle loans and her understanding of what would happen if she didn't make payments on those loans demonstrates that she knew her actions would harm or were substantially certain to injure the USA. Debtor's failure to disclose the sale to the USA or turnover the proceeds to the USA is further evidence of such willful and malicious conduct.

The USA requests that the entire amount of $52,048.56 plus interest be rendered nondischargeable; however, the Court finds that the USA only met its burden of proof as to the New Holland tractor. The Debtor testified at trial that the tractor was sold for $6,000-$8,000, but she could not remember the exact amount. This was the only evidence presented regarding the value of the tractor at the time of the sale. Therefore, in an effort to "split the baby," the Court finds that the debt owed by Debtor to the FSA for the tractor is due to be and hereby is nondischargeable in the amount of $7,000.00.

## CONCLUSION

Based on the foregoing, the Court finds against the USA and in favor of the Debtor on Counts I and II of the Complaint, and in favor of the USA and against the Debtor on Count III of the Complaint. The debt owed by Debtor to the USA is hereby rendered nondischargeable in the amount of $7,000.00.

This Memorandum Opinion and Order resolves all matters raised in the Complaint. This adversary proceeding shall be DISMISSED with prejudice as soon as practicable.

Dated: April 18, 2019

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE